United States District Court
Southern District of Texas
**ENTERED**
July 09, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KENYA HOLLIDAY, as Next Friend  §
of D.H., a Minor,  §
 §
    Plaintiff,  §
 §
v.  §   CIVIL ACTION NO. H-18-1412
 §
ANDREW SAUL,  §
COMMISSIONER OF THE SOCIAL  §
SECURITY ADMINISTRATION,  §
 §
    Defendant.  §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendant's Cross-Motion for Summary Judgment (Doc. 10) and Plaintiff's Cross-Motion for Summary Judgment (Doc. 12). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

## I. Case Background

Plaintiff Kenya J. Holliday, as next friend of D.H., filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income for D.H. under Title XVI of the Social Security Act ("the Act").

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 4, Ord. Dated May 17, 2018.

A.  __Medical History__

D.H. was born on May 17, 2006, the date that Plaintiff alleged to be D.H.'s disability onset date.[2]  Prior to the relevant time period,[3] D.H. was diagnosed with asthma, borderline intellectual functioning,[4] and mixed receptive-expressive language disorder.[5] In 2014, D.H. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").[6]

On August 26, 2014, Matthew P. Dickson, Ph.D., performed a psychological evaluation and found, based solely on his examination:[7]

> [D.H.'s] abilities to attend to, acquire, and use information, as well as his ability to complete tasks are moderately impaired. [D.H.'s] abilities to interact and relate to others are moderately impaired. [D.H.'s] abilities to move about, manipulate objects, attend to self-care and physical well-being are moderately impaired.[8]

As diagnoses, Dr. Dickson listed ADHD and nocturnal enuresis noting

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 110.

[3]    Although Plaintiff identified May 17, 2006, as the alleged onset date, unfavorable SSA rulings in August 2010 and February 2011 addressed D.H.'s disability status during his early years.  See Tr. 55, 110, 135-36.

[4]    In January 2010, D.H.'s full-scale intelligence quotient ("IQ") was measured at 74, which was described as within the Borderline range.  See Tr. 202. However, in December 2010, D.H.'s full-scale IQ was 79, which, on a different descriptive scale than the January test, fell within the Well Below Average range.  See Tr. 279.

[5]    See Tr. 204, 206-08, 215, 217.

[6]    See Tr. 332.

[7]    Dr. Dickson noted that he did not have access to current school or medical records.  See Tr. 335.

[8]    Tr. 335; see also Tr. 332-34.

also that borderline intellectual functioning and mild speech sound disorder needed to be ruled out.[9]

A speech and language evaluation report from August 30, 2014, stated that D.H. was entering the third grade and "d[id] not receive speech therapy or special education support."[10]

On November 6, 2015, Nicole Entrekin ("Entrekin"), a licensed psychological associate, performed a diagnostic interview and psychological evaluation.[11]   Entrekin identified the following issues as D.H.'s presenting problems: adjustment issues, hitting and kicking other children, difficulty making friends, bedwetting, hyperactivity, low academic performance/suspected reading disorder, lying and fabricating elaborate stories, self-injurious behaviors, and compulsive eating.[12]

Entrekin administered multiple tests.[13]   On a test measuring nonverbal intelligence, D.H. scored 75, placing him in the Borderline Impairment range.[14]   Other tests indicated more than moderate severity in the categories of cognitive and impulsivity/distractibility impairments.[15]   D.H. also exhibited a

---

[9]    See Tr. 335.

[10]   See Tr. 337.

[11]   See Tr. 381-86.

[12]   Tr. 381.

[13]   See Tr. 382-85.

[14]   See Tr. 382, 385.

[15]   See Tr. 383-84.

low self-concept and significant problems in the areas of attention, hyperactivity, and conduct.[16]  Entrekin diagnosed D.H. with adjustment disorder with mixed disturbances of emotions and conduct, disruptive behavior disorder, ADHD, academic problem, and enuresis.[17]

The evaluator opined, "The client appears to have minor difficulties grasping new concepts.  It is also likely that inattentive tendencies and distractibility are negatively influencing his school performance."[18]  She recommended that ADHD "remain a focus in treatment" and that treatment "assist the client with these adjustment and social difficulties and to improve overall mood functioning."[19]  Entrekin found D.H.'s prognosis to be good.[20]

**B.   School Records**

A June 2014 Individualized Education Program ("IEP") developed in Michigan at the end of second grade indicated that D.H.'s overall intellectual functioning recently had been measured to be 73, which was within the Borderline range.[21]  In contemporaneous

---

[16]   See id.

[17]   See Tr. 385.

[18]   Id.

[19]   Id.

[20]   See id.

[21]   See Tr. 164, 168.

testing, D.H. "demonstrate[d] reading, math and writing skills within the average expectations for his age" and demonstrated no significant weaknesses.[22]

The IEP also included results from behavior, social, language, vocabulary, articulation, and other testing.[23]  The results of teacher and parent ratings indicated that D.H. was exhibiting "serious difficulties related to his ADHD diagnosis," as well as conduct disorder, oppositional defiant disorder, learning problems, and difficulty with executive functioning related to learning.[24]

In a section of the IEP related to D.H.'s present level of academic achievement and functional performance, one teacher recounted a litany of difficulties D.H. experienced in the classroom but concluded, "[D.H.] ha[d] made a lot of progress [during the] school year.  He [was] working just below grade level in Social Studies, Reading, and Math."[25]  According to the IEP, D.H.'s test results "indicated that he ha[d] learned academic skills within the expectations for his chronological age, he [was] having significant difficulties with finishing independent work in the classroom and require[d] frequent reminders and accommodations by his classroom teacher to help him concentrate on his work and be

---

[22]     Tr. 169; see also Tr. 164.

[23]     See Tr. 164-68.

[24]     Tr. 169; see also Tr. 164.

[25]     Tr. 170.

more productive."[26]

The IEP indicated that D.H. would receive ongoing instruction and assessment in both general and special education settings.[27] Specifically identifying the educational setting, the IEP stated, "This student will fully participate with students who are nondisabled in the general education setting except for the time spent in separate special education programs/services provided outside of the general education classroom as specified in this IEP."[28]

Two of D.H.'s teachers completed reports in February 2015.[29] One of the teachers stated that D.H. "appear[ed] to enjoy being in the school environment[] but [did not] want to do his best" and that he was not "motivated to do well."[30]  The other teacher stated that D.H. liked and wanted to learn, especially science.[31]

As of an IEP meeting held on October 6, 2015, in Texas, D.H. was a fourth-grade student who was qualified to receive services based on his ADHD diagnosis.[32]  He received writing resource services, in-class support for language arts, and "accommodations

---

[26]    Tr. 171.

[27]    See Tr. 176-77, 181-82.

[28]    Tr. 182.

[29]    See Tr. 189-90.

[30]    See Tr. 189.

[31]    See Tr. 190.

[32]    See Tr. 359.

in both general education and special education setting[s] for academic success."[33]

The meeting notes indicated that D.H. was reading at the level of a second grader and demonstrated difficulty with forming complete sentences and editing his work.[34]   In math, his difficulties were in problem solving, illustrating a word problem, and computing, according to the notes.[35]   D.H.'s handwriting was reported as "neat and legible."[36]   D.H. was observed rushing through class work and having difficulty "keeping his hands and feet to himself and allowing personal space of others around him," "staying on task," and using appropriate means to get the teacher's attention.[37]   Goals were set in these areas and a behavior intervention plan was implemented.[38]

**C.  <u>Application to SSA</u>**

Two prior applications for supplemental security income were filed for D.H. and were denied on August 12, 2010, and February 11, 2011, both without appeals.[39]   Plaintiff applied a third time under

---

[33]    <u>See</u> <u>id.</u>

[34]    <u>See</u> <u>id.</u>

[35]    <u>See</u> <u>id.</u>

[36]    <u>Id.</u>

[37]    <u>Id.</u>

[38]    <u>See</u> Tr. 359-60, 376.

[39]    <u>See</u> Tr. 55, 135-36.

a protective filing date of March 17, 2014.[40]  Plaintiff alleged a disability onset of May 17, 2006, due to ADHD, "[l]earning [d]isability, can[']t sit still, has difficulties speaking, trou[b]le communicating, site [sic] of food causes throwing up, toddler level."[41]

On September 21, 2014, the SSA found D.H. not disabled at the initial level of review.[42]  At that time, a child and adolescent psychiatrist and a speech pathologist reviewed D.H.'s record for the SSA as medical experts ("Medical Experts").[43]  They opined that D.H. had no limitation in the domains of acquiring and using information and moving about and manipulating objects and that his limitation in each of the four other domains was less than marked.[44] In the notes supporting his finding that D.H. had no limitation in the domain of acquiring and using information, one Medical Expert noted that D.H. was not placed in special education classes for second grade and that D.H.'s full-scale IQ in May 2014 was 73, which was described as within the Borderline range.[45]

On November 12, 2014, Plaintiff requested a hearing before an

---

[40]   See Tr. 110-15.

[41]   Tr. 54, 139; see also Tr. 110.

[42]   See Tr. 54-69.  The record does not include an SSA decision on reconsideration.

[43]   See Tr. 59-61.

[44]   See Tr. 60-61.

[45]   See Tr. 60.

ALJ.[46]   In an updated disability report submitted on November 20, 2014, Plaintiff stated that D.H. was not focused at all and could not stay on task and that his concentration and behavior had worsened.[47]   The ALJ granted Plaintiff's request for a hearing and scheduled the hearing on April 20, 2016.[48]

## D.   **Hearing**

During the hearing, which was held via video conference, D.H. and his mother testified.[49]   D.H. testified first, indicating in response to the ALJ's questions that he liked school, that his favorite subject was science, especially experiments, and that his least favorite subject was writing.[50]   D.H. told the ALJ that he was in special education classes for part of the school day, which he clarified on further questioning to mean more than half of the school day, and that he "[s]ometimes" earned "S's" (Satisfactory) for grades.[51]   D.H. said that his mother had to remind him to complete his homework.[52]   He also provided testimony about his behavior at school and his activities with siblings and friends

---

[46]     See Tr. 70-72.

[47]     See Tr. 151.

[48]     See Tr. 83-88.

[49]     See Tr. 32-53.

[50]     See Tr. 37.

[51]     Tr. 39.

[52]     Id.

outside of school.[53]

Plaintiff corrected a few inaccuracies that she perceived in D.H.'s testimony regarding his behavior at school and activities outside of school.[54]  She described the amount of time D.H. was in special education as follows: "Well, they told me he was supposed to be going full-time.  You know, they just would take him out for, like, gym so he would be able to interact with the other kids."[55]  Plaintiff answered the ALJ's question about the "kinds of grades" D.H. received by describing them as "not good" and "borderline."[56]  When asked if D.H. had ever been held back a year, Plaintiff answered no but explained, "They tried to last year in Michigan, but the when we transferred here, they just automatically put him into his regular grade."[57]  Plaintiff stated that she had to offer rewards to try to get D.H. to complete his homework.[58]  Plaintiff also reported that D.H. "forg[ot] a lot" and needed more testing in that area.[59]

## E.   Post-Hearing Consultative Examination

The ALJ requested a consultative psychological evaluation,

---

[53]   See Tr. 39-43.

[54]   See Tr. 44.

[55]   Tr. 44-45.

[56]   Tr. 45.

[57]   Id.

[58]   See Tr. 47.

[59]   Tr. 51.

which was performed on September 12, 2016, by Gayle Pitcher, Ph.D.,
("Dr. Pitcher").[60]   Dr. Pitcher indicated that neither medical
records nor school records were available for her review.[61]

Plaintiff informed Dr. Pitcher that the ADHD was manageable
when D.H. took his medication.[62]   Plaintiff reported that D.H.'s
daily activities included going to school, playing outside,
watching television, and playing on electronic tablets.[63]   She also
reported that D.H. was able to bathe and dress himself, to put away
his belongings with verbal cues, and to use the telephone; however,
he was not able to use the microwave or make a sandwich.[64]
Plaintiff said that D.H. had not repeated any school grade level
but received special education services for all of his academic
classes and performed academically below expectations.[65]

Dr. Pitcher observed that D.H. "spoke in simple sentences that
were grammatically correct," but "appeared to use below average
vocabulary for a child of his age."[66]   Dr. Pitcher noted that D.H.
"demonstrated very simple, but generally logical thought process

---

[60]     See Tr. 401-16.

[61]     See Tr. 401.

[62]     See Tr. 402.

[63]     See Tr. 403.

[64]     See id.

[65]     See Tr. 404.

[66]     Tr. 405.

11

that was goal directed."[67]   His abstract thinking was only "minimally adequate," according to Dr. Pitcher, but his "fund of information and intelligence appeared to be average, based on informal assessment."[68]

In testing, D.H.'s full-scale intelligence quotient ("IQ") measured at 69, which was within the uppermost portion of the Extremely Low range.[69]  Other results indicated that he was in the second-grade range in reading, the fourth-grade range in math, and the third-grade range in spelling.[70]  Dr. Pitcher found no evidence of a specific learning disability.[71]  She diagnosed D.H. with a mild intellectual disability in addition to ADHD and enuresis.[72]

She opined that D.H.'s prognosis was guarded as he "continue[d] to have significant learning difficulties" but that the "prognosis could improve with consistent remedial education efforts."[73]  As far as functional capacity, Dr. Pitcher assessed D.H. to be "unlikely to have the ability to sustain concentration and persist in work/academic-related activity at a reasonable pace

---

[67]   Id.

[68]   Tr. 405-06.

[69]   See Tr. 407.

[70]   See Tr. 412.

[71]   See id.

[72]   See Tr. 412-13.

[73]   Tr. 413.

due to overall lower intellectual functioning."[74]  According to Dr. Pitcher, D.H. also "appear[ed] to be impaired" in his ability to problem solve and understand new information.[75]

## F.   Commissioner's Decision

On December 23, 2016, the ALJ issued an unfavorable decision.[76] The ALJ acknowledged that the alleged onset date for the current application was May 17, 2006, but determined that the prior decisions in August 2010 and February 2011 were binding and found no reason to reopen those applications.[77]

The ALJ found that D.H. had not engaged in substantial gainful activity since the application filing date of March 17, 2014.[78]  The ALJ recognized the following impairments as severe: "asthma, [ADHD], speech and language impairment, and borderline intellectual functioning."[79]   The ALJ found that D.H. did not meet the requirements of any of the medical listings for presumptive disability ("Listings").[80]  The decision specifically addressed Listings 102.10 and 102.11 for hearing loss, Listing 103.03 for asthma, Listing 111.09 for communication impairment associated with

---

[74]   Id.

[75]   Id.

[76]   See Tr. 10-27.

[77]   See Tr. 10.

[78]   See Tr. 13.

[79]   Id.

[80]   See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. B.

neurological disorder, Listing 112.02 for neurocognitive disorders, Listing 112.07 for somatic symptom and related disorders, and Listing 112.11 for neurodevelopmental disorders.[81]

The ALJ began with D.H.'s prior medical and psychological treatment dating as far back as 2010.[82]  The ALJ discussed D.H.'s diagnosis and treatment of ADHD, reports from his grandmother and teachers, and information in his educational records.[83]  The ALJ also discussed the results of: (1) the January 2010, December 2010, May 2014, and September 2016 IQ testing; (2) the November 2015 nonverbal intelligence testing; (3) the psychological evaluations in January 2010, August 2014, November 2015, and September 2016; and (4) the results of a speech pathologist's evaluation in August 2014.[84]

Regarding the August 2014 consultative psychological evaluation, the ALJ assigned partial weight to the Dr. Dickson's opinions on D.H.'s functional capabilities, stating that no evidence supported a finding that D.H. had any difficulties in moving about and manipulating objects and that more recent records supported a finding of marked difficulties in attending and

---

[81]     See Tr. 13-14.

[82]     See Tr. 15-16.

[83]     See Tr. 16-17.

[84]     See Tr. 15-17.

14

completing tasks.[85]

The ALJ also assigned partial weight to Dr. Pitcher's opinions included in the September 2016 consultative psychological evaluation, explaining that "[e]arlier testing, examinations, school records, and other opinions d[id] not support marked and extreme limitations in all areas as rated by Dr. Pitcher."[86] Because Dr. Pitcher did not explain the "significant decrease in cognitive testing scores" from prior testing, the ALJ questioned those results, stating that Dr. Pitcher relied too much on subjective reporting and poor medication compliance.[87]

The Medical Experts' opinions from September 2014 also garnered partial weight from the ALJ.[88]  The ALJ specifically noted that they relied on information that D.H. was not in special education in second grade and that D.H. had scored in the Borderline range on his IQ test.[89]  The ALJ concluded that "[m]ore recent testing, examinations, school records, and other medical opinions support[ed] greater limitations in the areas of acquiring and using information and attending and completing tasks."[90]

---

[85]    See Tr. 17.

[86]    Tr. 18.

[87]    Id.

[88]    See id.

[89]    See Tr. 20 (stating that the Examiners found no limitation in the domain of acquiring and using information because D.H. "had not required special education courses and his [IQ] scores were not significantly low").

[90]    Tr. 18.

The ALJ then turned to his findings in terms of the six functional equivalence domains,[91] beginning with acquiring and using information.[92] Based on the evidence, the ALJ determined that D.H. had less than marked limitation in this category, citing: (1) D.H.'s enjoyment of science but not writing; (2) his mother's testimony that D.H.'s grades were borderline and that he needed reminders to complete homework; (3) D.H.'s placement in special education for a portion of the day; and (4) teacher reports that D.H. "appeared to enjoy school and wanted to learn" but that he struggled to achieve despite "special education, peer tutoring, intervention, and accommodations with assignments."[93]

In summary, the ALJ stated:

> The medical evidence of record supports a finding of less than marked limitation in acquiring and using information.  While the claimant struggled to achieve high grades, he had not been retained in any grades and he did not require special education for the full school day.  According to the claimant's teachers, he showed a desire to learn.  The claimant's [IQ] scores, while not stellar, were not significantly low and no examiner indicated whether his scores were considered valid reflections of his intellectual capacity.[94]

The ALJ's conclusion stood in contrast to the Medical Experts who

---

[91]   To determine whether the child's severe impairment or combination of impairments functionally equals a Listing, the Commissioner evaluates the child's ability to function in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

[92]   See Tr. 19.

[93]   Tr. 19-20.

[94]   Tr. 20.

found no limitation at all in this domain.

For the remaining five domains, the ALJ made the following determinations: (1) "marked limitation in attending and completing tasks;" (2) "less than marked limitation in interacting and relating with others;" (3) "no limitation in moving about and manipulating objects;" (4) "less than marked limitation in the ability to care for himself;" and (5) "less than marked limitation in health and physical well-being."[95]  As the ALJ found that D.H. did not have an impairment or a combination of impairments that met, medically equaled, or functionally equaled the severity of any Listing, the ALJ concluded that D.H. was not disabled at any time from March 17, 2014, through the date of the ALJ's decision.[96]

On February 17, 2017, Plaintiff appealed the ALJ's decision.[97] On March 14, 2018, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[98]  After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[99]

---

[95]    Tr. 20-23, 25-26.

[96]    See Tr. 26-27.

[97]    See Tr. 109, 197-200.

[98]    See Tr. 1-3.

[99]    See Tr. 1-3; Doc. 1, Pl.'s Orig. Compl.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

### A.   Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  The regulations provide that a child's disability claim should be evaluated according to the following sequential three-step process: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has a medically determinable impairment or combination of impairments that is severe; and (3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of a Listing.  See 20 C.F.R. § 416.924(b)-(d).  If the child's impairment or combination of impairments meets or medically or functionally equals a Listing and meets the duration requirement, the child is considered disabled.  See 20 C.F.R. § 416.924(d)(1).

To determine whether the child's severe impairment or combination of impairments functionally equals a Listing, the Commissioner evaluates the child's ability to function in the

18

following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  If a child's impairment results in "marked" limitations in two domains or an "extreme" limitation in one domain, that impairment is deemed functionally equal to a Listing. See 20 C.F.R. § 416.926a(a).  In the process of evaluating the child's functional ability, the Commissioner must review all of the evidence of record and "compare [the child's] functioning to the typical functioning of [same-aged children] who do not have impairments."  20 C.F.R. § 416.926a(f)(1); see also 20 C.F.R. § 416.926a(b).

**B.  Substantial Evidence**

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek v. Berryhill, ____ U.S. ____, 139 S. Ct. 1148, 1154 (2019)(internal quotations marks omitted)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Id.  It only requires "more than a mere scintilla."  Id. (quoting Consolidated Edison Co., 305 U.S. at 229).

The Commissioner has the responsibility of deciding any

conflict in the evidence. <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. <u>See</u> <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ should have found that D.H.'s functional limitation in the domain of acquiring and using information was "marked." Plaintiff contends that the ALJ's conclusion that D.H.'s limitation in that domain was "less than marked" is not supported by substantial evidence. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

20

A "marked" limitation is one that seriously interferes with the child's ability "to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It is "more than moderate" but "less than extreme." Id. As applied to test scores:

> [A child has] a "marked" limitation when [he has] a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [his] day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

The regulations further explain how the SSA considers test scores:

> (i) . . . [The SSA] will not rely on any test score alone. No single piece of information taken in isolation can establish whether [the child has] a "marked" or an "extreme" limitation in a domain.
>
> (ii) [The SSA] will consider [the child's] test scores together with the other information [the SSA has] about [the child's] functioning, including reports of classroom performance and the observations of school personnel and others.
>
> . . . .
>
> (iii) If there is a material inconsistency between [a child's] test scores and other information in [his] case record, [the SSA] will try to resolve it. The interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test. But it is also [the SSA's] responsibility to ensure that the evidence in [the child's] case is complete and consistent or that any material inconsistencies have been resolved.

20 C.F.R. § 416.926a(e)(4).

The domain of acquiring and using information covers learning and thinking, as well as the tools, such as language, that facilitate those processes.  See SSR 09-3p, 2009 WL 396025, at *2. "[T]his domain considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school."  Id.  However, "[b]ecause much of a preschool or school-age child's learning takes place in a school setting, preschool and school records are often a significant source of information about limitations."  Id. at *3. Factors such as the type, level, and frequency of special education and/or other accommodations inform the decision as to the severity of the child's impairments.  See id.  School, however, is not the only setting in which the child's ability to learn and think is assessed.  See id.  Medical and non-medical sources, including the child himself, provide pertinent information.  See id.

The SSA provides a list of examples of typical functioning by age group as a frame of reference to assist SSA adjudicators in evaluating a child's limitation in this domain.  See id. at *5. For a school-age child, which is one in the age range of six through eleven, the examples given are:

- Learns to read, write, and do simple arithmetic.
- Becomes interested in new subjects and activities (for example, science experiments and stories from history).
- Demonstrates learning by producing oral and written projects, solving arithmetic problems, taking tests, doing group work, and entering into class discussions.
- Applies learning in daily activities at home and in the community (for example, reading street signs, telling

time, and making change).
• Uses increasingly complex language (vocabulary and grammar) to share information, ask questions, express ideas, and respond to the opinions of others.

Id.; see also 20 C.F.R. § 416.926a(g)(2)(iv).

The ALJ complied with the legal standards in assessing whether D.H.'s impairments met or medically or functionally equaled a Listing. After reaching the conclusion that the severity of D.H.'s impairments did not meet or medically equal the criteria of any impairment, the ALJ thoroughly discussed D.H.'s history and treatment, including medical evidence, psychological evaluations, speech and language assessments, cognitive and psychological testing, D.H.'s grandmother's comments to a doctor, D.H.'s testimony, his mother's testimony, teacher reports, and educational records. The ALJ did not focus solely on D.H.'s IQ or any other single factor but considered all of the pertinent information about D.H.'s functioning drawn from his educational performance, special education services, reports of his interactions with teachers, peers, and family, medical and psychological history, and his own testimony. As was his directive, the ALJ weighed the evidence and conflicting IQ scores, explained the weight given various aspects of the record, and resolved all material inconsistencies concerning D.H.'s limitations in the domain of acquiring and using information. Simply put, the ALJ performed the task assigned to him.

Plaintiff disagrees, contending that the ALJ mischaracterized

23

the evidence concerning: (1) grade retention; (2) degree of special-education services; (3) desire to learn; (4) the Medical Experts' opinions; and (5) validity of IQ scores.

Regarding grade retention, Plaintiff argues that the ALJ's statement that D.H. had not been retained in any grade misconstrued the evidence because Plaintiff provided anecdotal commentary at the hearing to the effect that D.H.'s school in Michigan "tried" to retain D.H. before Plaintiff relocated to Texas where the new school "just automatically put him into his regular grade."[100] Plaintiff's testimony does not render untrue the statement that D.H. was never required to repeat a grade level.  In fact, the evidence, including self-reports to Dr. Pitcher, shows that he was not.  Furthermore, the educational records from Michigan do not indicate that the school did or was intending to hold back D.H. at any level.  The ALJ did not mischaracterize the evidence on grade retention.

Plaintiff further takes issue with the ALJ's assertion that D.H. was not in special education for a full day, arguing only that the ALJ "fail[ed] to explain the significance of less than a full day of special education as it relate[d] to the functional domain of acquiring and using information."[101]  In a 2009 Social Security Ruling, the SSA explained that the significance of "the kind,

---

[100]     Tr. 45.

[101]     Doc. 12-1, Attach. 1 to Pl.'s Cross-Mot. for Summ. J., Brief in Support of Pl.'s Cross-Mot. for Summ. J. p. 7.

level, and frequency of special education" is found in its being helpful information about a child's limitations in this domain. SSR 09-3p, 2009 WL 396025, at *3. Again, the ALJ's statement was accurate. Both D.H. and his mother testified that he was in special education for most but not all of the school day. Elsewhere in the record, references were made to D.H.'s placements in special education for core academic classes and in regular education for non-academic subjects. The ALJ was under no obligation to explain in his decision the significance that the SSA guidelines place on the degree of immersion in special education.

Plaintiff castigates the ALJ for equating a desire to learn with being able to learn, arguing that "[j]ust because a child shows a desire to learn does not mean he is capable of acquiring *and* using information."[102]   Be that as it may, the SSA directs adjudicators to consider whether the child shows an interest in new subjects and activities. See id. at *5. The ALJ's statement that D.H. showed a desire to learn is supported by D.H.'s own testimony that D.H. liked science, particularly experiments, and by a teacher's report that he enjoyed and wanted to learn. The ALJ did not err in considering D.H.'s interest in learning and did not rely solely on that interest to assess his limitations in this domain.

Another issue for Plaintiff was that, despite according the Medical Experts' opinions only partial weight overall, the ALJ

---

[102]   Id.

25

credited their assessment of D.H.'s May 2014 IQ score as within the Borderline range.  The ALJ separately discussed all of the IQ scores, including the September 2016 testing that was performed two years after the Medical Experts' record review.  Citing the Medical Experts, the ALJ stated that D.H.'s IQ scores were "not significantly low."[103]  Plaintiff's challenge ignores that, while the ALJ credited that portion of the Medical Experts' review, the ALJ did not credit other portions, specifically because more recent records called those opinions into question.  The ALJ specifically rejected the following opinions: (1) D.H. had no limitation in the domain of acquiring and using information; and (2) he had not required special education.  The court finds no inconsistency in the ALJ's assessment of the Medical Experts' opinions.

That leads the court to the last of Plaintiff's points related to her argument that the ALJ misconstrued the evidence.  Plaintiff contends that the ALJ was "requiring [Plaintiff] to prove a negative" in regard to the validity of the IQ scores.[104]  The statement she challenges is the ALJ's comment that "no examiner indicated whether [D.H.'s] scores were considered valid reflections of his intellectual capacity."[105]  Plaintiff argues that no record evidence supports the contention that the scores were not valid

---

[103]    Tr. 20.

[104]    Doc. 12-1, Attach. 1 to Pl.'s Cross-Mot. for Summ. J., Brief in Support of Pl.'s Cross-Mot. for Summ. J. p. 7.

[105]    Tr. 20.

reflections of D.H.'s intellectual capacity.  The ALJ was presented a wide range of IQ scores, from 69 to 79 with at least two different descriptive scales.[106]  His comment simply highlighted his quandary of how to determine to which test to give the greatest weight in assessing where D.H.'s actual intellectual ability fell. The ALJ's comment about the validity of the IQ scores did not taint his assessment.

Plaintiff presents additional concerns about the consideration the ALJ gave to the IQ scores.  She contends that Dr. Pitcher's testing was more comprehensive than earlier IQ tests and was "more accurate and reliable,"[107] warranting a finding that D.H. had "marked" limitations in acquiring and using information.  Citing an article entitled "Descriptive Statistics and Psychological Testing,"[108] Plaintiff asserts that two standard deviations on an IQ test equals a score of 70 or below.  Because D.H.'s score of 69 fell between two and three standard deviations, Plaintiff continues, it reflected that D.H. had "marked" limitations in the domain of acquiring and using information.

As explained above, the determination whether a child has "marked" limitations is not based on "any test score alone," and

---

[106]    For example, the January 2010 IQ score of 74 was described as borderline while a higher score of 79 was described as well below average.

[107]    Doc. 12-1, Attach. 1 to Pl.'s Cross-Mot. for Summ. J., Brief in Support of Pl.'s Cross-Mot. for Summ. J. p. 9.

[108]    See Doc. 12-1, Ex. A to Brief in Support of Pl.'s Cross-Mot. for Summ. J., Article.

"[n]o single piece of information taken in isolation" establishes "marked" limitations.  20 C.F.R. § 416.926a(e)(4)(i).  Plaintiff's assessment is based solely on one test score and runs afoul of the SSA's method for making such determinations.  In this case, the ALJ had multiple tests scores that he properly considered together with the other information as to D.H.'s functioning to conclude that D.H. had "less than marked" limitations.  <u>See</u> 20 C.F.R. § 416.926a(e)(4)(ii).

The ALJ discounted Dr. Pitcher's testing because she did not explain the "significant decrease in cognitive testing scores."[109] As Plaintiff notes, without records from prior testing, Dr. Pitcher could not explain the discrepancy as she lacked knowledge of it. Although the ALJ may have questioned the September 2014 IQ test results, he offered a more comprehensive reason for discounting her opinion.  The ALJ found that Dr. Pitcher's opinions were not consistent with all of the other evidence in the record.  The court also notes that Dr. Pitcher's evaluation report was not fully consistent with such a low IQ score.  Despite the IQ score of 69 that fell within the Extremely Low range, Dr. Pitcher opined that D.H.'s "fund of information and intelligence appeared to be *average*," not even borderline or low average, much less extremely low.[110]   Additionally, Dr. Pitcher diagnosed D.H. with *mild*

---

[109]    Tr. 18.

[110]    Tr. 406 (emphasis added).

intellectual disability.   The ALJ found that D.H.'s day-to-day functioning in learning and thinking activities was not consistent with an IQ score of 69, and the evidence supports that finding.

Moreover, the ALJ's conclusion related to D.H.'s limitations in the domain of acquiring and using information is supported by substantial record evidence.   Dr. Dickson found Plaintiff to be moderately impaired in this domain.   Entrekin, who found that D.H. had "minor difficulties grasping new concepts," opined that inattentiveness and distractibility negatively impacted his school performance, that ADHD should be the focus of treatment, and that his prognosis was good.[111]   The majority of the IQ and other cognitive assessments placed D.H. in the borderline or average range.   As noted above, despite the full-scale IQ score of 69, Dr. Pitcher found D.H.'s intellectual disability to be mild.

The school records indicate that D.H. enjoyed the school environment and was making progress toward grade-level performance in social studies, reading, and math.   Taken as a whole, more than scintilla of evidence shows that D.H. experienced no more than moderate limitations in the domain of acquiring and using information.   Accordingly, the court finds that D.H.'s limitations did not rise to the level of "marked" as they did not *seriously* interfere with his ability to independently initiate, sustain, or complete activities or rise above the moderate level.   The ALJ's

---

[111]      Tr. 385.

decision was legally correct and supported by substantial evidence.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and that Plaintiff's motion be **DENIED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 9th day of July, 2019.

Nancy K. Johnson
United States Magistrate Judge

30